**UNITED STATES of America, Plaintiff,**

v.

1. **BASLER TURBO–67 CONVERSION DC–3 AIRCRAFT, FAA REGISTRATION NUMBER N8059P; 2. Basler Turbo–67 Conversion DC–3 Aircraft, FAA Registration Number N72BF; 3. Basler Turbo–67 Conversion DC–3 Aircraft, FAA Registration Number N95BF; 4. Basler Turbo–67 Conversion DC–3 Aircraft, FAA Registration Number N96BF; 5. $50,000 Held as a Deposit Upon Basler Turbo–67 Conversion DC–3 Aircraft, Co-**lumbian Registration Number HK3292; **6. $50,000 Held as a Deposit Upon Basler Turbo–67 Conversion DC–3 Aircraft, Columbian Registration Number HK3293; 22. One Technology Licensing Agreement; Defendants,**

**and**

**Regarding the Claim of Air Colombia, Ltda., Claimant.**

**CIV–90–1827–PHX–RCB.**

United States District Court,
D. Arizona.

July 3, 1995.

Janet Napolitano, United States Attorney, District of Arizona and Reid C. Pixler, Assistant United States Attorney, Phoenix, Arizona, for Plaintiff.

Holly R. Skolnick, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Miami, Florida, for defendant Air Columbia, Ltda.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, FINAL ORDER OF FORFEITURE AND DEFAULT JUDGMENT

BROOMFIELD, District Judge.

### I. BACKGROUND

#### A. Introduction

This case is a civil forfeiture action brought by the United State *in rem* against the aircraft, deposits, bank account funds, certificates of deposit, and the Technology License Agreement ("the TLA") listed as defendants in the caption of this order. The government alleges that the defendant assets are money obtained through drug trafficking or money laundering or were acquired with the proceeds of such transactions. Forfeiture of the assets is sought pursuant to a number of federal statutes.

On October 15, 1992, the government moved for summary judgment with respect to all twenty-two defendants. One claimant group—the Golb group—made no response and summary judgment was granted for the government regarding the financial accounts, defendants 7 through and including 21. Three claimant groups—the Basler group, the Innovair group, and the Air Colombia group—filed responses to the government's motion. The Basler group and the government resolved all issues by stipulations which resulted in the dismissal of the Basler group from the action. By order of this court filed March 31, 1994, the motion for summary judgment regarding the Innovair group was granted, and the claim of Innovair group, including the claim of Carmichael, was dismissed.

■ Claimant's counsel alleged the Air Colombia group was comprised of two different business entities, Air Colombia, S.A., which had filed a timely claim and answer, and Air Colombia, Ltda., which had not. Upon the evidence and arguments submitted, the court found Air Colombia, S.A. did not exist and never existed, a fact which Air Colombia, S.A. conceded. Despite the fact it had never been formed, Air Colombia, S.A. argued it had standing. It is hornbook law that a nonexistent entity may neither sue nor be sued. *See, e.g., Oliver v. Swiss Club Tell,*

222 Cal.App.2d 528, 35 Cal.Rptr. 324, 329 (1963); 59 Am.Jur.2d, *Parties* §§ 20, 42, 239 (1987). If a nominal party asserting a claim does not exist, the court lacks jurisdiction over the claim. *See, e.g., Oliver,* 35 Cal.Rptr. at 329; 59 Am Jr.2d, *supra,* § 239; *see also Trustees of Huntington v. EPA,* 55 F.R.D. 445, 454 (E.D.N.Y.1972) (holding that nonexistent entity with nonexistent members lacked standing).

■ The court granted Air Colombia, Ltda. additional time within which to file a claim and answer, subsequently filed May 20, 1994. On April 25, 1995, relying upon an affidavit of a cooperating defendant in Chicago, plaintiff moved to strike the claim and answer of Air Colombia, Ltda. on the basis the real party in interest in this forfeiture action and the source of the money and the source of control of the aircraft is Guillermo Angel, a member of the Cali Drug Cartel. Counsel for Air Colombia, Ltda. has advised plaintiff that it will not respond to the motion to strike. The Local Rules of Practice 1.10(i) allow entry of judgment for plaintiff. However, the motion and supporting papers must show the moving party is entitled to judgment as a matter of law. *United States v. Real Property Located at Incline Village,* 47 F.3d 1511 (9th Cir.1995), *Marshall v. Gates,* 44 F.3d 722 (9th Cir.1995) and *Henry v. Gill Industries, Inc.,* 983 F.2d 943 (9th Cir.1993).

#### B. Facts

Setting forth a concise statement of the "facts" in this case simply is not possible. The case is unusually complex and the issues contested with a variety of evidence, the authenticity of some of which is challenged. Given that the government alleges the Air Colombia group is under the control of the Colombian drug cartel, it is not surprising that this claimant group and the government present very different accounts of certain key factual issues. Thus, what follows is not intended to be a comprehensive account of the many events that led to this litigation. Instead, this section is intended merely to provide a backdrop for the ultimate resolution of specific factual and legal disputes which are discussed more extensively in the Analysis portion of this order.

The events began in 1988. The Basler group and the Innovair group formed two companies for the purpose of developing technology for converting DC–3 aircraft to turbo power. Burton Golb apparently inquired about the purchase of the proposed aircraft. Specifically, Golb stated that his brother-in-law, Roberto Franco, had contact with a company called Air Colombia. A man, introduced as Ruben Osorio, was represented to be the principal of Air Colombia, and interested in the project to convert DC–3s. In November 1988, Basler met in Colombia with Golb, Franco Osorio, and Antonio Reyes–Garzon. Basler's impression was that Franco was the manager of a company called Air Caribe and that Reyes–Garzon was the manager of a company called Air Colombia, Ltda. Basler also concluded that Osorio was the man with the money.

At this time, Reyes–Garzon indeed was the manager of Air Colombia, Ltda. and had been since about May or June of that year. Air Colombia, Ltda. was formed in 1980 as an airfreight company and, at the time of the November 1988 meeting, was allegedly owned by Joaquin Fernandez (Duque) and Roberto Franco's wife, Maria Amparo Carrillo. According to the records produced by the company, Osorio was not an owner of the company and never had been.

According to his deposition testimony, Reyes–Garzon came aboard in May or June of 1988 and the company had very little value. It owned some abandoned airplanes which were basically worthless and the company was not flying any routes. Although the company had little assets, its owners had a plan to turn the company into an S.A.—a corporation—and raise capital by issuing shares of stock to investors in exchange for capital contributions. Franco and his wife, Amparo Carrillo, directed Reyes–Garzon to begin forming Air Colombia, S.A. According to Reyes–Garzon, Franco put him in contact with possible investor companies.

Reyes–Garzon testified that on November 30, 1988, he purchased a one-half interest in Air Colombia, Ltda. by purchasing all of Duque's interest as well as some of Amparo Carrillo's interest. He purchased his share for the relatively insignificant amount of fifteen million pesos.

On December 12, 1988, Air Colombia, Ltda. entered into four contracts for the construction of modified DC–3 aircraft. Air Colombia, Ltda. was not a contracting party: the contracts were signed by Teresa Franco, Roberto Franco's sister and Burton Golb's wife, on behalf of Air Colombia, S.A., which was not yet formed. On February 25, 1989, the same parties contracted for the modification of two additional DC–3s to be supplied by Air Colombia, Ltda. These aircraft were never delivered and only the two $50,000 deposits are included in this action as defendants # 5 and # 6.

It is undisputed that Air Colombia, Ltda. from its own resources, did not have the ability to pay for the planes as of December 12, 1988. According to the deposition testimony of Reyes–Garzon and documents which he produced, on December 20, 1988, Air Colombia, Ltda. entered into contracts with three investor companies: Antilles and Carribean Petroleum Services ("Antilles"), Perforacion y Mantenimiento De Pozos, Ltda. ("Pozocol"), and Transportes Petroleros, Ltda. ("Transportes"). The Antilles and Transportes contracts each required the contribution of approximately $3,000,000 for the construction of one DC–3 which would be exchanged for stock in the new corporation. Pozocol could either pay for the aircraft and exchange it for stock or keep the aircraft and contribute other capital.

In conjunction with the execution of the contracts, Air Colombia, Ltda. executed promissory notes in favor of each company, allegedly secured by the assets of Air Colombia, Ltda. However, it is undisputed that Air Colombia, Ltda. did not have sufficient assets to secure the notes or repay the proceeds in any manner. Reyes–Garzon alleged that on February 8, 1990, a fourth contract and promissory note was entered into between Air Colombia, Ltda. and Corporacion Petroleros Colombiana, S.A. ("Corpetrol"), which was very similar to the Pozocol contract and note.

Neither the investor companies nor Air Colombia, Ltda. paid funds directly to Basler or Innovair during 1988 or 1989. Instead,

the investor companies allegedly delivered money to Colombian money exchange businesses—known as cambistas—which then sent dollars to Burton Golb in the United States. Golb then forwarded the funds in furtherance of the Air Colombia, S.A. contracts. Golb forwarded $639,500 in 1988 and another $3,957,831 in 1989. Thereafter, funds were sent to Air Colombia's attorney, Richard Geiger, in Miami, Florida, who forwarded payments approximating $1.7 million. Thus, a total of approximately $6.3 million was sent for the construction of the aircraft on behalf of the alleged four investor companies. Richard Geiger had personal contact with Ruben Osorio, who retained him as counsel for both Air Colombia and a related company, Air Caribe. Geiger testified the man he knew as Osorio was the owner of both companies and Reyes–Garzon was simply an employee/manager.

In July 1990, defendant 1 was completed. Reyes–Garzon testified that Air Colombia hired Caribbean Air and Marine Service (CAMS) to facilitate the exportation of the aircraft from the U.S. and import the aircraft into Colombia. The plan allegedly was that Air Colombia, Ltda. would arrange for a $1.1 million letter of credit to be issued in favor of CAMS. CAMS then would pay Basler $1.1 million when taking possession of the airplanes and then cause title to be transferred to Air Colombia, in Miami. Unbeknownst to Air Colombia, CAMS was an undercover FBI operation investigating money laundering activities and which had no pilots.

Ricardo Londono negotiated on behalf of Air Colombia with CAMS. Londono is a fugitive from money laundering charges in the United States. According to FBI transcripts of telephone calls between Londono and CAMS, Londono communicated with an unidentified agent of Air Colombia who in turn dealt with Reyes–Garzon.

A letter of credit in the amount of $1.1 million was issued in favor of CAMS from Banco Ganadero in Colombia, which was subsequently altered and made in favor of Basler. Reyes–Garzon testified that he decided not to use CAMS because its representatives did not speak Spanish. The FBI transcripts, however, show that an undercover agent working with the CAMS operation informed Londono that CAMS wanted to back out of its role in assisting Air Colombia.

The entire letter of credit was drawn upon. The government then seized the aircraft on August 2, 1990. The financial accounts except the TLA were seized shortly thereafter. The TLA was seized approximately one year later.

The seizure of all the defendant assets stemmed from the government's investigation of Burton Golb. In 1990, Golb was indicted on numerous charges of money laundering in the District of Arizona. This court presided over Golb's trial at which he was convicted of numerous acts of money laundering. The evidence adduced at Golb's trial, in conjunction with the jury's findings, establishes that all the money received on behalf of the contracts in the name of Air Colombia, S.A., other than the letter of credit, was the proceeds of illegal drug or money laundering transactions. No party disputes that the $6.3 million received as payments on the aircraft was tainted money forfeitable to the government in the absence of a valid defense. With respect to the Air Colombia group, one question concerning the "innocent owner" defense remains. Is the relationship between the laundering of narcotics proceeds of the Black Market so public in Colombia that it amounts to "common knowledge?" If it is, the mere use of the market to conduct financial transactions as described herein defeats a claim of innocence by the Air Colombia group.

On April 25, 1995, the United States filed a motion to Strike the Claim and Answer of Air Colombia, Ltda. supported by an affidavit from Luis Carlos Herrera–Lizcano, a Colombian convicted of money laundering for his role in the acquisition of aircraft intended to be used to transport cocaine into the United States. Herrera appears to qualify as an expert in the fields of financial money laundering as well as the aircraft industry in Colombia. Herrera Lizcano stated he personally knew the man who provided the money for the operation of Air Colombia, Ltda. and who was the actual source of control of the company, Guillermo Angel. Angel had acquired his substantial wealth as the result

of his lengthy and lucrative participation with the Cali drug cartel in the trafficking of cocaine from Colombia into the United States.

Herrera Lizcano was present near the Air Colombia, Ltda. hanger when Reyes–Garzon reported to Guillermo Angel regarding his trip to Phoenix, Arizona, in August, 1992, for the purpose of giving testimony in this action. Reyes–Garzon reported the details of the deposition to his boss, Angel. Despite his sworn testimony, including the production of a substantial number of records pursuant to government interrogatories, in which Antonio Reyes–Garzon repeatedly stated he was the majority owner and manager of Air Colombia, Ltda., it was clear to Herrera–Lizcano that Reyes–Garzon was merely an employee of Angel. Angel explained to Herrera–Lizcano about the modified DC–3 aircraft he was having constructed, about the delays in the construction and the considerable expenses incurred and why he preferred this aircraft for use in his air trafficking enterprise. Angel indicated he had hired lawyers and would do whatever it took to get the airplanes returned to him. Angel told Herrera–Lizcano that he had to use "testaferros" or straw owners like Reyes–Garzon, because he could not come forward due to his involvement in cocaine trafficking. Based upon these observations, the government alleges that the real identity of Ruben Osorio is Guillermo Angel. The court also takes judicial notice of the fact that William Moran, the Miami attorney who first obtained extensions of time within which the Air Colombia group could file a claim and answer and who introduced Osorio/Angel to attorney Richard Geiger, has been indicted in Miami for his participation in a criminal enterprise with the founders of the Cali drug cartel.

Herrera–Lizcano also supports the expert testimony offered by the government regarding the source of funds involved in the Colombian Black Market. Herrera–Lizcano agrees with Dr. Grosse that the source of the U.S. currency in the Black Market is narcotics dollars. Further, it is common knowledge in the Colombian economy that the Black Market not only contains narcotics dollars supplied by the cartel, but this financial exchange is a technique by which the drug cartels launder their illegal proceeds.

Herrera–Lizcano refuted the allegation, presented both by hearsay testimony of Reyes–Garzon and by affidavits executed by representatives of each of the four "investor" companies under penalty of perjury of the laws of the United States of America, that contributions of capital for the construction contracts of the Basler Turbo 67 aircraft were made by delivering billions of pesos to a cambista named "Betty and Associates" in Colombia for conversion to dollars and transfer to the United States. Herrera–Lizcano indicated that transactions of such magnitude would be inconvenient, if not impossible and would never be conducted due to the likelihood of discovery. Legitimate businessmen do not conduct entire business transaction in cash or currency. However, traffickers always attempt to use currency to prevent the tracing of the funds in an effort to conceal their wealth, and the source and control of their front companies. The funds transferred to the aircraft construction contracts were U.S. dollars, proceeds of illegal exchanges for controlled substances, which never left the control of the money laundering accounts of the drug cartel. The funds were simply directed to their final disposition by Guillermo Angel. The funds in the Colombian Black Market are frequently used to facilitate illegal activity.

It is remarkably easy to obtain false or perjured documents from Colombia for a price, according to Herrera–Lizcano. The government alleges that there simply is no fear of perjury because a Colombian citizen cannot be extradited from Colombia to face criminal prosecution in the United States. The government points to a series of photographs of the alleged addresses of the investor companies. Either the addresses did not exist, the business at the address had no relationship to the alleged investor company or the facility was an obvious sham, such as the office for two of the investor companies found by a DEA Special Agent. The Agent was able to obtain official stationery from the office only when the attendant removed blank typing paper from a desk drawer and

stamped the name and address of the investor company on the paper with an ink pad.

The expense associated with the operation of a turbo powered DC–3 or a Convair 580 in Colombia would be so prohibitively high that legitimate commercial freight hauling enterprise could not afford to operate such aircraft. Only trafficker companies appearing to act as a freight transporter would have the economic resources to operate such aircraft.

Herrera–Lizcano observed the financial documents, including the alleged tax forms provided by Reyes–Garzon and the investor companies during discovery. Herrera–Lizcano recognized the documents as falsified tax forms which were not the legitimate forms. The fake forms were not filed with the appropriate authority. The financial statements submitted appeared to be similar to falsified forms Herrera–Lizcano had obtained for one of these fake companies. The government demonstrated in its motion for summary judgment that the financial statements of the front companies, when adjusted for inflation, conclusively established the companies did not generate the currency required to provide the capital for the construction of the aircraft. Simply stated, the funds for the construction of the aircraft did not originate with the front companies nor did the funds pass through the accounts of the companies. The financial analysis provided by the government established that the substantial increase in the accounts receivable for all four companies actually consumed any excess cash, it did not provide a source of cash.

## II. *ANALYSIS*

■ The government has established that approximately $6.3 million dollars was transferred into the United States as a capital contribution of the construction of the defendant aircraft. That money traveled through the Colombian Black Market. The court has previously held the money is forfeitable in the absence of a valid defense and that none of the investor companies contributed any funds toward the construction of the aircraft. The evidence of whether it is common knowledge in Colombia that the Black Market is a money laundering vehicle for narcotics traffickers is disputed.

Air Colombia, Ltda. must rely upon the testimony of Reyes–Garzon and members of the front companies who have submitted affidavits pursuant to 28 U.S.C. § 1746, stating both their lack of knowledge and the fact that each has submitted funds for the construction of the aircraft. The government asserts common knowledge exists, in reliance upon evidence submitted by Dr. Grosse and Herrera–Lizcano.

The evidence submitted by the government is more persuasive. Dr. Grosse conducted empirical studies of the currency flows through the Black Market which included interviews of the owners and operators of cambistas involved in the Black Market. His professional conclusion is that in fact the great majority of the funds involved in the Black Market are in fact proceeds of narcotic transactions. As to the extent of common knowledge, Dr. Grosse relies upon his years of residence in Colombia and the extent of media coverage to determine that from his interviews, conversations and observations in Colombia, it is common knowledge that drug money is involved in the Colombian Black Market. Dr. Grosse has no other attachment or involvement in this case other than the fact his opinion was solicited by the government, based upon his professional writings and his testimony in other unrelated matters.

Herrera–Lizcano corroborates the professional opinion of Dr. Grosse, based upon his knowledge of the financial and business markets in Colombia in his role as a legitimate operator of a commercial aviation company and his role as a facilitator for the drug cartel. As a resident of Colombia, his observations are particularly compelling.

The evidence submitted by or on behalf of Air Colombia, Ltda. was largely by affidavit. The government sought to strike the affidavits on the basis that testimony from a Colombian in Colombia under oath, pursuant to 28 U.S.C. § 1746, should not be admissible. Basically, the government argues that because the affiant makes the declaration, "... under penalty of perjury under the laws of the United States of America ..." there is functionally no oath where the Colombian constitution has been amended to bar the

extradition of a Colombian citizen for criminal prosecutions including perjury. The government reasons where there is no possible punishment for perjury, there is no oath.

■ The court need not reach this issue. The court has previously found the financial documents submitted on behalf of Air Colombia, Ltda., as analyzed by the government prove none of the investor companies actually contributed any capital, despite the allegations to the contrary by the affiants. Because the testimony offered by Reyes–Garzon and the representatives of the investor companies concerning the source of funds has been established to be false according to their own business records, the court is free to discount the entire submission.

> If, on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. In other words, if the evidence would compel a directed verdict or judgment n.o.v. against the opponent of the motion, there is no genuine issue and the motion must be granted. (citing cases) Thus, the court may grant summary judgment if the allegations in the counteraffidavit are simply unworthy of belief. (citing cases including *U.S. v. 1980 Red Ferrari*, 827 F.2d 477 (9th Cir.1987). Relying on this principle, some cases have granted summary judgment for the government where the claimant's defense of innocent ownership was simply incredible. In short, the attorney who believes he can avoid summary judgment by waving his arms and producing a lot of smoke will be disappointed. (citing cases).

1 D. Smith, *Prosecution and Defense of Forfeiture Cases* 10.06 P10–87 to 10–89 (1992).

The court therefore finds that the money passing through the Colombian Black Market is substantially related to the proceeds of drug trafficking and money laundering activities. Further, these facts are common knowledge in Colombia. Therefore, any claimant who knew that funds were transferred through the Black Market cannot establish an innocent owner defense. In this analysis, Reyes–Garzon as well as all of the representatives of the alleged investor companies had knowledge the funds were trans-

ferred through the Black Market from the admissions which they have made. These proceeds in the approximate amount of $6.3 million dollars, traced to defendants 1–6 and 22, are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 31 U.S.C. § 5313(a) and § 5324, as well as 18 U.S.C. § 1956 and § 1957, and all property traceable to such transactions. *U.S. v. All Funds On Deposit,* 801 F.Supp. 984, 989 (E.D.N.Y.1992).

■ With regard to the letter of credit in the amount of $1.1 million, Air Colombia, Ltda. has elected to provide no further information. The source of these funds was previously alleged by Air Colombia, Ltda. to be the sale of a DC–6. The undisputed evidence has established that the aircraft crashed, was not insured, and was a total loss. Despite these admissions, Air Colombia Ltda. alleged that shortly before it crashed the DC–6 was sold for more than $1¼ million dollars. Air Colombia, Ltda. never explained how this aircraft could be sold to provide the $1.1 million funds transferred by letter of credit while the DC–6 was still pledged as a security to the investor companies. Air Colombia, Ltda. also never explained why just days before the alleged sale Reyes–Garzon purchased additional interest in Air Colombia, Ltda. based upon a total value of the company which represented a mere fraction of the alleged sale price of this one asset of the company. Finally, the alleged sale value contradicts the testimony of Reyes–Garzon when he indicated the aircraft was in bad shape, had so little value that it was not insured and after it crashed, Air Colombia, Ltda., not an alleged purchaser, was responsible to the Colombian Military and farmers for the damages when the aircraft fell from the sky. From the alleged minutes of business meetings of Air Colombia, Ltda. it was noted that the DC–6 could be replaced for less than $200,000, but this course of action was rejected due to the bad experience encountered. From Herrera–Lizcano, Warren Basler, DEA Task Force Agent Kelly, the fair market value of the DC–6 was considerably less than half the claimed amount.

■ The evidence submitted proves the source of the $1.1 million letter of credit was not the sale of the DC–6 aircraft. The involvement of Ricardo Londono in the attempted delivery of the letter of credit through CAMS, coupled with the "cell" communication channels which prevented Londono from speaking directly with Reyes–Garzon regarding the financial transactions, is an indicia of money laundering activity. Finally, the only reason a letter of credit was used for the final payment on defendant # 1, was to make an appearance of compliance with the financial law of Colombia regarding an INCOMEX License, authorizing the export of funds for the acquisition of an asset. The letter of credit was intended by Reyes–Garzon to be used to fix the value of defendant # 1 at $1.1 million for the purposes of taxation upon importation into Colombia. The contract value of the aircraft was approximately $2½ million dollars. That is why Reyes–Garzon insisted upon the submission of false bills of sale, one for the value of the plane and the second for the value of improvements to the plane. The government has established probable cause (indeed, more than probable cause) to believe the source of funds of the letter of credit is proceeds of drug trafficking, and the funds were laundered through the financial transactions described. In forfeiture cases, once probable cause for forfeiture has been established, a claimant may still prevail by proving by a preponderance of the evidence that the defendant property was not involved in illegal activity. *$5,644,540.00 In United States Currency,* 799 F.2d 1357 at 1363 (9th Cir.1986). *See also United States v. One 1977 Mercedes Benz,* 708 F.2d 444, 447 (9th Cir.1983). Once probable cause has been established, the burden shifts to the claimant to establish that defendants are not subject to forfeiture. Claimant has presented no evidence to overcome the allegations filed in the First Amended Verified Complaint. Claimant failed to refute the government's evidence. The funds are forfeited to the government pursuant to 21 U.S.C. § 881(a)(6), and 18 U.S.C. § 981 for violations of 18 U.S.C. § 1956 and § 1957.

Air Colombia, Ltda. elected not to submit any further evidence regarding how the action of a promoter of a corporation not yet formed might prevent forfeiture. In the light of the uncontradicted evidence now submitted by plaintiff, it has been established that the real party in interest in this forfeiture action is Guillermo Angel. With the ability to produce false documentation, tax records, and false affidavits from individuals in Colombia, including attorneys, it is little wonder why the litigation in this action has extended for more than five years.

■ The government has established the defendant aircraft were intended to be used to transport cocaine and facilitate the transportation, sale, receipt, possession and concealment of cocaine. Ruben Osorio was the hidden owner and real source of control of both Air Colombia, Ltda. and Air Caribe. Air Caribe has repeatedly lost aircraft either to crash or seizure while in the act of transporting thousands of kilograms of cocaine destined for market in the United States. The aircraft are seldom, if ever, reported as lost. Rather, the investigation of DEA has disclosed the lost aircraft is replaced with a "twin" or a clone. The data plate of the original aircraft is removed and the tail number falsified prior to a flight involving the transportation of cocaine. If the aircraft is lost, a replacement aircraft is obtained by corrupt aircraft brokers in the United States and made to resemble the aircraft lost, including the re-attachment of the original data plates and tail number. This practice has become so common in Colombia that even an untrained eye can detect the metal fatigue in the area where the data plates are repeatedly pried off and replaced. The falsification of data plates, tail numbers, log books, safety inspections and records, coupled with the rugged use of these aircraft on unimproved landing strips, creates a hazardous, if not life threatening, circumstance to all who come in contact with these aircraft during their operation in general aviation. In addition, the government has established through the unrefuted evidence of Herrera–Lizcano that Guillermo Angel caused the aircraft to be constructed with the laundered proceeds of his drug trafficking empire for the intended purpose of more efficiently transporting cocaine. Defendants number 1 and number 2

and the substitute *res* bonds representing defendants number 3 and number 4 are therefore forfeited to the United States pursuant to 21 U.S.C. § 881(a)(4). Defendant #22 is the liquidated sales proceeds from the interlocutory sale of defendant #3. It is subject to the same analysis provided herein, and subject to forfeiture for the same reasons.

▮ Plaintiff has established, without contradiction, the real party in interest who provided the funds for the construction of the aircraft is Guillermo Angel. The claims and answers in this action by Antonio Reyes–Garzon by and on behalf of Air Colombia, Ltda., Air Colombia, S.A., and the four false investor companies all failed to truthfully identify Guillermo Angel as the real party in interest. The claim failed to recite the action by his agent, Reyes–Garzon, was authorized by Guillermo Angel. The claim and answer filed by Antonio Reyes–Garzon does not meet the requirement of Rule C(6), Supplemental Rules For Certain Admiralty and Maritime Claims and is therefore stricken. Based upon the factual and legal analysis contained herein, the United States has established sufficient grounds to support the forfeiture of all remaining defendants, including defendants number 1 and 2, and the substitute *res* bonds for defendants 3–6 and 22.

IT IS ORDERED granting the government's motion to strike the claim and answer of Air Colombia, Ltda., by and through Reyes–Garzon. Defendants number 1 and 2, and the substitute *res* bonds for defendants 3–6 and 22 are forfeited to plaintiff. The United States Marshal shall dispose of the defendants according to law.