# United States Court of Appeals for the Federal Circuit

---

**INNOVAIR AVIATION LIMITED,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5025

---

Appeal from the United States Court of Federal Claims in case no. 96-CV-408, Senior Judge Loren A. Smith.

---

Decided: January 25, 2011

---

H. CHRISTOPHER BARTOLOMUCCI, Hogan Lovells US LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief were TY COBB and JOSHUA D. HAWLEY.

SHERYL L. FLOYD, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were TONY WEST, Assistant Attorney Director, JEANNE E. DAVIDSON, Director. Of

counsel on the brief was MARK A. MELNICK, Assistant Director.

—————————

Before GAJARSA, LINN, and PROST, *Circuit Judges.*

GAJARSA, *Circuit Judge.*

The issue before this court is whether or not a contract right was extinguished as part of a seizure pursuant to 21 U.S.C. § 881. The United States ("Government") appeals the final decision of the United States Court of Federal Claims ("Court of Federal Claims"), which held that the Government had taken Innovair Aviation Limited's ("Innovair") property without just compensation under the Fifth Amendment. *Innovair Aviation, Ltd. v. United States* (*Innovair III*), 72 Fed. Cl. 415, 416 (2006). Because we find that the Court of Federal Claims lacked subject matter jurisdiction, we reverse the judgment.

## BACKGROUND

Innovair's Fifth Amendment takings claim against the Government arises from a lengthy procedural history spanning the past three decades and involving litigation in various federal courts. In order to place the issues in proper perspective, we must review the background and each of the proceedings in historical sequence.

### A.

In the mid-1980s, Bryan Carmichael and Barry Wilson investigated a method of upgrading DC-3 planes, which had been in service for many decades, by replacing the planes' piston engines with turboprop engines. *Innovair III*, 72 Fed. Cl. at 417. Mr. Carmichael and Mr. Wilson partnered with the Basler Group, a family-owned business, to perform the conversions. *Id.* The partnership subsequently established two corporations: one was

Innovair, a Hong Kong corporation, formed to perform all foreign sales and conversions, except for those under the Foreign Military Sales Act ("FMSA"), and the other was Basler Turbo Conversions, Inc. ("BTC"), a domestic corporation, formed to perform all domestic sales and conversions, plus those under the FMSA. *Id.* The two corporations had a cross ownership where Mr. Carmichael and Mr. Wilson owned 51% of Innovair and 49% of BTC, while the Basler Group owned 51% of BTC and 49% of Innovair. *Id.*

The Federal Aviation Administration ("FAA") requires a Multiple Supplemental Type Certificate[1] ("MSTC") to perform an unlimited number of plane conversions commercially. *Id.* On June 24, 1988, in anticipation that the FAA would issue an MSTC to BTC, Innovair and BTC executed a Technology License Agreement ("TLA") for Innovair's exclusive right "to market, manufacture, sell, and use the [MSTC] and conversion kits based upon it" in exchange for $1,675,000. Innovair paid BTC $300,000 by July 1, 1988 and the remaining balance of $1,375,000 on or after April 15, 1989. In February of 1990, the FAA granted BTC an MSTC on the DC-3 plane conversion technology. *Innovair III*, 72 Fed. Cl. at 417.

In December of 1988, Innovair and BTC contracted to sell six planes to Air Colombia. *Id.* at 418. Air Colombia

---

[1] Before a developer can make a significant modification to an aircraft, the developer must obtain a "one-off supplemental type certificate" from the FAA that allows for the modification of a limited number of aircraft. *Innovair III*, 72 Fed. Cl. at 417 n.2. The developer must also perform safety testing and provide the testing data to the FAA. *Id.* If the FAA determines that the modification is safe, the FAA issues a "multiple supplemental type certificate" that allows for the modification of an unlimited number of aircraft. *Id.*

presented itself as a legitimate cargo carrier from Colombia, South America, *id.*, but the Government began to expose the airline's ties to a drug cartel around the time the contracts were executed, *Innovair Aviation, Ltd. v. United States* (*Innovair II*), 58 Fed. Cl. 560, 560 (2003). Two of the plane contracts were later canceled, and one of the four remaining contracts was for the conversion and sale of Aircraft N95BF for $2,800,000. *Innovair III*, 72 Fed. Cl. at 418.

In 1990 and 1991,[2] Innovair contracted with United Technology Corporation ("UTC"), a United States airplane parts manufacturer. *Id.* Pursuant to the agreement, Innovair granted UTC the exclusive right to sell the plane conversion technology in most of Asia. *Id.* In return, UTC committed to purchase from Innovair at least five conversion kits per year for seven years. *Id.*

## B.

On August 2, 1990, the Government seized the four Air Colombia planes pursuant to 21 U.S.C. § 881 because the Government alleged that Air Colombia was under the control of a drug cartel and that the money Air Colombia used to pay for the four planes was traceable to drug proceeds. *Id.* at 418, 422. Two of the seized planes were still in the conversion process, including Aircraft N95BF. *Id.* at 418.

On November 29, 1990, the Government brought an *in rem* action ("Arizona Litigation") against the four planes in the United States District Court for the District of Arizona ("Arizona Court"). *Id.* The *in rem* action was brought in the Arizona Court because the seizure of the

---

[2] In 1990, Innovair and UTC had a preliminary agreement, and in 1991, they had a seven-year agreement. *Innovair III*, 72 Fed. Cl. at 418 n.6.

aircraft stemmed from the Government's investigation of Burton Golb, who was convicted of money laundering in the Arizona Court. *United States v. Basler Turbo-67 Conversion DC-3 Aircraft*, 906 F. Supp. 1332, 1336 (D. Ariz. 1995); *see* 21 U.S.C. § 881(j) ("[A] proceeding for forfeiture under this section may be brought . . . in the judicial district in which the criminal prosecution is brought."). The evidence presented at Mr. Golb's trial established that "all of the money received on behalf of the contracts in the name of Air Colombia . . . was the proceeds of illegal drug or money laundering transactions." *Basler*, 906 F. Supp. at 1336.

On July 12, 1991, the controller of Basler Flight services, also owned by the Basler family, informed the Government that Innovair used part of the Air Colombia proceeds to pay for a portion of the TLA. *Innovair III*, 72 Fed. Cl. at 418. Because of this information, the Government added the TLA to the *in rem* action on July 16, 1991. *Id.*

After the TLA was seized, Innovair offered to post a substitute *res* bond of $1,250,000 in the Arizona Litigation to obtain the right to operate under the TLA. In a related action ("Wisconsin Litigation") brought in the United States District Court for the Eastern District of Wisconsin ("Wisconsin Court"),[3] Innovair had requested a preliminary injunction requiring BTC to transfer the conversion technology to Innovair pursuant to the TLA; however, the injunction was denied by the Wisconsin Court. Because of the denial of the injunction, Innovair withdrew its substitute *res* bond offer in the Arizona Litigation on September 17, 1991. On October 18, 1991, Innovair, however, again offered to post a substitute *res* bond on terms that Inno-

---

[3]    The specifics of the Wisconsin Litigation are discussed hereinafter.

vair contends were "strikingly similar" to terms BTC later offered.  Innovair alleged that the Government ignored its second proposal that was characterized by the Government as "far too little and far too late."

On December 9, 1991, the Government and BTC stipulated to a substitute *res* bond transferring the TLA to BTC and extinguishing the rights of all other claimants. In exchange, BTC posted a substitute *res* bond amount of $1,375,000 representing the amount Air Colombia paid to Innovair and Innovair paid to BTC.  *Innovair III*, 72 Fed. Cl. at 418.  BTC also agreed to finish the conversion of Aircraft N95BF, which BTC would sell in the open market with the proceeds being paid to the Government in the amount equal to Air Colombia's interest in Aircraft N95BF.  *Id.* at 418–19.

Innovair objected to the substitute *res* bond alleging eight different reasons: (1) it was willing to post a substitute *res* bond for the TLA on the same terms as BTC, but was not afforded the opportunity to do so; (2) the value of the TLA would be irreparably harmed if it was used by BTC who lacked international marketing experience; (3) its contract with UTC would be impaired and potentially irreparably damaged if BTC was allowed to sell conversions internationally; (4) if it prevailed on its claim for the return of the TLA, the TLA would not be returned in the same condition as at the time of seizure because BTC could have established contractual relationships in Innovair's exclusive territory; (5) it would be severely damaged if BTC were allowed to retain profits from international sales, including from Aircraft N95BF; (6) the bond would interfere with the Wisconsin Litigation; (7) the bond amount was miscalculated and artificially inflated; and (8) the Arizona Court lacked authority to allow BTC to post bond.

Over Innovair's objection, the Arizona Court approved the substitute *res* bond finding that: (1) BTC had standing to post the bond; (2) Innovair's standing to object to the bond was questionable, but the Arizona Court assumed Innovair had standing for the purpose of deciding the motion to approve the bond; (3) no equitable ground for refusing to approve the bond existed; (4) approval of the bond would not interfere with the Wisconsin Litigation; (5) the Government's best interest was protected; and (6) the "compromise" proposal[4] suggested by Innovair had no merit and would result in a windfall for Innovair. The Arizona Court granted summary judgment for the Government in the civil forfeiture action, permitting the Government to seize, *inter alia*, the TLA and Aircraft N95BF. *Basler*, 906 F. Supp. at 1334.

Innovair appealed the Arizona Court's "determin[ation] that Innovair lacked standing" to "assert[] a claim to both assets." *United States v. Basler Turbo-67 Conversion DC-3 Aircraft*, No. 94-16876, 1996 WL 88075, *1 (9th Cir. Feb. 29, 1996). The Ninth Circuit reversed the Arizona Court and found that Innovair had standing as to both the TLA and Aircraft N95BF and was an innocent owner that did not have any knowledge of the source of Air Colombia's money. *Id.* at *1–2. The court also found that the Government's transfer of the TLA to BTC terminated Innovair's rights in the TLA. *Id.* at *2.

---

[4]    Innovair's "compromise" proposal suggested that the substitute *res* bond be replaced with an agreement that granted BTC only the right to market Aircraft N95BF and Aircraft N510NR, another seized plane. Innovair contended that the Government would receive $1,827,807 from the sale of Aircraft N95BF, which would secure Air Colombia's funds intended as progress payments for the plane and would give the Government no basis for keeping the TLA as security for the funds.

On remand, the Arizona Court granted summary judgment for Innovair, finding the Government's seizure of the TLA and Aircraft N95BF wrongful because Innovair was an innocent owner of the assets. *Innovair III*, 72 Fed. Cl. at 419. However, because the TLA had already been transferred to BTC by the Government and could not be retransferred to Innovair, the Arizona Court awarded Innovair $1,939,310 plus prejudgment interest as compensation for the wrongful seizure of the TLA. According to the Arizona Court, $1,939,310 represented Innovair's share of the cost of obtaining another MSTC.

The Government appealed and argued that the Arizona Court lacked jurisdiction to award any amount in excess of the substitute *res* bond amount, while Innovair cross-appealed and argued that the Arizona Court undervalued the TLA. In the case's second appeal, the Ninth Circuit vacated in part and remanded in part because it determined that the Arizona Court had jurisdiction over the TLA only up to the amount of the substitute *res* bond, which was $1,375,000, plus prejudgment interest. *United States v. Basler Turbo-67 Conversion DC-3 Aircraft*, Nos. 99-15369, 00-15090, 2000 WL 1770611, *1 (9th Cir. Nov. 30, 2000).

On remand for the second time, in the third proceeding the Arizona Court awarded Innovair the substitute *res* bond amount plus prejudgment interest, totaling $1,783,879.25, for the TLA. The order resulting from this third proceeding was not appealed by Innovair.

C.

In May of 1991 while the Arizona Litigation was pending, Innovair and BTC brought separate actions against each other in the Wisconsin Court. The parties asserted numerous causes of action against each other, including breach of fiduciary duty and breach of contract.

Innovair moved for a preliminary injunction requiring BTC to provide Innovair with information about DC-3 plane conversion technology. *Carmichael v. Basler Turbo Conversions, Inc.*, No. 91-3278, 1992 WL 9867, *1 (7th Cir. Jan. 24, 1992). The court denied the motion and consolidated the two actions. Innovair appealed the Wisconsin Court's denial of a preliminary injunction. *Id.* The Seventh Circuit vacated the Wisconsin Court's denial for lack of detailed findings and remanded the matter to the district court for further proceedings. *Id.* at *5.

On September 23, 1993, Innovair and BTC settled all of their claims against each other in the Wisconsin Litigation. The settlement agreement required BTC to pay $2,750,000 to Innovair in exchange for Innovair relinquishing its rights to the TLA. As part of the agreement, Innovair retained the right to assert a claim against the Government for the seizure of the TLA.

D.

Following the settlement of the Wisconsin Litigation, but concurrent with the then-pending Arizona Litigation, Innovair filed the present action in the Court of Federal Claims on July 10, 1996. *Innovair III*, 72 Fed. Cl. at 419. Innovair alleged that the Government's seizure of the TLA without just compensation violated its Fifth Amendment property right. *Id.* The trial court stayed the action pending resolution of the second Ninth Circuit appeal in the Arizona Litigation. *Id.*

Upon lifting the stay, the trial court requested briefing on "why this case should not be dismissed in light of . . . the Federal Circuit's . . . decision in *Vereda LTDA v. United States*, 271 F.3d 1367 (Fed. Cir. 2001)." *Innovair Aviation, Ltd. v. United States* (*Innovair I*), 51 Fed. Cl. 569, 569 (2002). *Vereda* held that the Court of Federal Claims' Tucker Act jurisdiction was preempted by the

comprehensive statutory scheme in the Controlled Substances Act ("CSA") for reviewing an *in rem* forfeiture. *Vereda*, 271 F.3d at 1375. The trial court "carefully reviewed the Court of Appeals' *Vereda* opinion and [wa]s fairly well convinced it must dismiss this case." *Innovair I*, 51 Fed. Cl. at 569. However, after briefing and oral argument, the court found that it had subject matter jurisdiction over Innovair's Fifth Amendment takings claim because Innovair did not bring a substantive challenge to the Government's seizure of the TLA. *Innovair II*, 58 Fed. Cl. 560. The court held that Innovair demonstrated "that the transfer of its TLA was a taking outside the scope of *Vereda*." *Id.* at 563; *see Vereda*, 271 F.3d 1367.

After the trial court found it had jurisdiction over Innovair's takings claim, the court granted summary judgment for Innovair because the forfeiture of the TLA, of which Innovair was an innocent owner, resulted in a taking due just compensation under the Fifth Amendment. *Innovair III*, 72 Fed. Cl. at 425. In reaching its holding, the trial court first found that Innovair held a valid property interest in the TLA in the form of contract rights as of the time of the seizure and maintained that interest until the property's forfeiture. *Id.* at 421. The trial court also found that Innovair's rights were not terminated by either a termination letter BTC sent to Innovair because BTC failed to complete the termination process, or by the settlement of the Wisconsin Litigation because Innovair expressly retained the right to bring suit against the Government on the TLA. *Id.* at 420–21. Second, the trial court determined that the Government's actions constituted a *per se* taking because the Government permanently deprived Innovair of the TLA by transferring the TLA to BTC. *Id.* at 422–25. The court

further found that the substitute *res* bond amount did not justly compensate Innovair for the TLA. *Id.* at 425.

After the trial court entered its summary judgment order, the Government filed a motion for reconsideration based on *AmeriSource v. United States*, 525 F.3d 1149 (Fed. Cir. 2008). *Innovair Aviation, Ltd. v. United States* (*Innovair IV*), 83 Fed. Cl. 105, 106 (2008). In *Ameri-Source*, this court held that the Government's seizure and retention of property under its police power does not constitute a "public use" within the meaning of the Fifth Amendment Takings Clause, regardless of whether the property owner is innocent. 525 F.3d at 1152–57. The trial court denied the motion and distinguished *Ameri-Source* because the seized TLA was not an instrument in the alleged criminal activity and was not subject to forfeiture as held by the Ninth Circuit. *Innovair IV*, 83 Fed. Cl. at 107.

Next, the trial court determined what just compensation Innovair was due. *Innovair Aviation, Ltd. v. United States* (*Innovair V*), 83 Fed. Cl. 498 (2008). The court awarded damages to Innovair for the value of the TLA at the time of the taking based on the discounted cash flow method with a 10% discount rate. *Id.* at 502, 506. After the parties submitted calculations of the total damages in this case, the court awarded Innovair $16,100,741. The award amount consisted of $6,122,468, which is the $7,497,468 that represented the net income value of the discounted TLA as of the date of taking minus the $1,375,000 previously awarded to and received by Inno-vair, and $9,978,273, which is the interest through the date of final judgment on September 30, 2009.

The Government appeals the trial court's decisions, raising three specific issues: (1) whether the court erred in exercising subject matter jurisdiction over Innovair's Fifth

Amendment takings claim, (2) whether the court erred in finding that the transfer of the TLA constituted a taking for public use without just compensation, and (3) whether the court erred in applying a 10% discount rate to calculate the fair market value of the TLA. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

In reviewing the judgments of the Court of Federal Claims, this court reviews legal conclusions *de novo*. *Holland v. United States*, 621 F.3d 1366, 1374 (Fed. Cir. 2010); *Suess v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008); *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998); *Columbia Gas Sys., Inc. v. United States*, 70 F.3d 1244, 1246 (Fed. Cir. 1995). Whether the Court of Federal Claims has jurisdiction is a question of law. *Vereda*, 271 F.3d at 1374; *Adkins v. United States*, 68 F.3d 1317, 1321 (Fed. Cir. 1995).

The Government contends that the trial court lacked jurisdiction over Innovair's suit. For the following reasons, we agree.

Initially, the trial court itself was "fairly well convinced it must dismiss this case." *Innovair I*, 51 Fed. Cl. at 569. In the court's show cause order requesting briefing on how this case was distinguishable from the *Vereda* case, the trial court correctly explained:

> Congress created a comprehensive administrative and judicial review of government forfeitures under 21 U.S.C. § 881 and 18 U.S.C. § 981. In *Vereda*, the Federal Circuit made it clear that "[t]his statutory scheme evinces Congress' intent to preempt any Tucker Act jurisdiction over a money claim that challenges the propriety of an *in rem* administrative forfeiture of property seized . .

. .'" While the Plaintiff does not challenge the propriety of the administrative forfeiture, it instead challenges the award it received for the property taken. However, the Federal Circuit also made it clear in *Vereda* that this Court cannot "entertain a taking[s] claim that requires the court to 'scrutinize the actions of another tribunal.'" While the Plaintiff here does not ask this Court to overturn the forfeiture proceedings of the [Arizona Court], it is asking the Court to find that the district court reached a wrong decision as to the value of the [TLA] that the government took from Innovair. This the Court cannot do, nor can it review the forfeiture decision of the district court.

*Id.* (citations omitted); *see Vereda*, 271 F.3d 1367.

However, after receiving the parties' briefing and hearing oral arguments, the court found that it had subject matter jurisdiction. *Innovair II*, 58 Fed. Cl. at 562–63. The trial court reviewed *Vereda* and the facts and allegations surrounding Innovair's claim and found that the only distinguishing fact between the two cases was that Innovair was not bringing a substantive challenge to the Government's seizure of the TLA, while the claimant in *Vereda* attacked the merits of the forfeiture. *Id.*; *see Vereda*, 271 F.3d at 1375.

Contrary to the trial court's finding, this court's decision in *Vereda* is controlling and directly on point. *See Vereda*, 271 F.3d 1367. In *Vereda*, the Drug Enforcement Administration ("DEA") seized a plane in which Vereda, Ltda. ("Vereda") had an interest because there was probable cause to believe that the plane was used to transport drugs and had been purchased with drug proceeds. *Id.* at 1370. After the DEA declared the airplane administratively forfeited, Vereda brought suit alleging that the

DEA's forfeiture constituted "a compensable taking under the Fifth Amendment." *Id.* This court held that the trial court lacked jurisdiction in *Vereda* "because relevant statutes provide for a comprehensive administrative and judicial system to review the *in rem* administrative forfeiture of property seized pursuant to 21 U.S.C. § 881." *Id.* at 1375. Thus, the Court of Federal Claims' "Tucker Act jurisdiction over the subject matter covered by the scheme [wa]s preempted." *Id.* The court found that the CSA's statutory scheme provided for complete review of "(i) the merits of a seizure and forfeiture of property initiated under 21 U.S.C. § 881 and (ii) any related due process claims." *Id.*

In addition, this court held in *Allustiarte v. United States*, 256 F.3d 1349, 1351 (Fed. Cir. 2001) that the Court of Federal Claims lacked jurisdiction to entertain a takings claim that "would have to determine whether appellants suffered a categorical taking of their property at the hands of the . . . courts." In *Allustiarte*, debtors who filed for bankruptcy alleged that "the losses they suffered as a result of the bankruptcy courts' approval of the actions of the [court-appointed] bankruptcy trustees constitute[d] takings of which they [we]re entitled to just compensation." *Id.* at 1350–51. This court found that exercising jurisdiction "would require the court to scrutinize the actions of the bankruptcy trustees and courts." *Id.* at 1352.

In this case, the CSA's comprehensive statutory scheme vested in the Arizona Court exclusive jurisdiction to approve the substitute *res* bond, which necessarily included the extinguishing clause. *See Vereda*, 271 F.3d at 1375 ("Congress created a statutory scheme that provides a claimant . . . with the ability to challenge the merits of an *in rem* forfeiture . . . before a district court.")

Before the Arizona Court, Innovair had the opportunity to object to the substitute *res* bond and did object on numerous grounds. However, Innovair did not object to the clause in the substitute *res* bond that extinguished all of the rights of other claimants. *See* J.A. 69–70 ("[A]ny claimant or potential claimant receiving notice of this Stipulated Substitute Res Bond[] shall have no claim to the Technology Licensing Agreement."). Innovair's failure to object is particularly telling because Innovair clearly anticipated that it might be found "entitled to return of the [TLA]" when it objected to the substitute *res* bond on the ground that "if BTC [wa]s allowed to post a bond for the [TLA], the government w[ould] not be able to return Innovair's asset in the same condition as it was at the time of the seizure." Because Innovair anticipated that it might later prevail as an innocent owner after BTC posted bond, it was on notice that it should contest the approval of the bond on the ground that the approval would permanently deprive Innovair of the TLA. Thus, any potential relief for Innovair should have been brought through the Arizona Court, where Innovair could have objected to the extinguishing clause and then appealed if the objection was overruled.

Innovair argues that it was deprived of its interest in the TLA when the Arizona Court approved the substitute *res* bond. If the Arizona Court's approval allowed a taking of the TLA to occur, Innovair should have appealed that approval to the Ninth Circuit to protect its interest in the TLA. However, Innovair failed to appeal the Arizona Court's approval of the substitute *res* bond, including the extinguishing clause, to the Ninth Circuit. *See Basler*, 1996 WL 88075, at *1. Innovair limited its first appeal to the Arizona Court's finding that Innovair lacked standing to challenge the substitute *res* bond, *id.*, and its second appeal to the Arizona Court's valuation of the TLA, *Ba-*

*sler*, 2000 WL 1770611, at \*1. Innovair's failure to appeal the approval of the bond to the Ninth Circuit is dispositive of its claim and extinguished jurisdiction of the Court of Federal Claims over Innovair's claim.

As this court held in *Vereda*, the Court of Federal Claims "does not have jurisdiction to review the decision of district courts" and "cannot entertain a taking[s] claim that requires the court to 'scrutinize the actions of' another tribunal." *Vereda*, 271 F.3d at 1375 (quoting *Allustiarte*, 256 F.3d at 1352). Indeed, the Court of Federal Claims "does not have jurisdiction over [a] taking[s] claim requiring a determination of the correctness of the administrative forfeiture." *Id.* at 1375. Innovair admits that in this action against the Government it is seeking just compensation for the full value of the TLA. Consideration of Innovair's claim necessarily involves a collateral attack on the Arizona Court's approval of the substitute *res* bond, which encompassed determining whether the amount was the fair value of the TLA. *See* 19 U.S.C. § 1606 ("The appropriate . . . officer shall determine the domestic value, at the time and place of appraisement, of any . . . merchandise . . . seized . . . ."); 21 C.F.R. § 1316.98 ("Where a conveyance is being forfeited in a judicial proceeding for a drug-related offense, the owner may obtain release of the property by filing a substitute res bond with the seizing agency. The conveyance will be released to the owner upon the payment of a bond in the amount of the appraised value of the conveyance . . . ."). In fact, it is clear from the trial court's opinion that its holding is premised on its belief that the bond amount did not reflect the fair market value of the TLA. *Innovair*, 72 Fed. Cl. at 425. Although the United States Attorney's Office never formally appraised the TLA, the Arizona Court's approval of the substitute *res* bond necessarily included a finding that the bond amount was the fair value of the TLA. Thus, the

trial court's finding that the bond amount was not just compensation is a collateral attack on the Arizona Court's approval of the bond amount. *Vereda* prohibits precisely such a collateral attack.

Vereda challenged "the substantive validity of the forfeiture," but "the Court of Federal Claims does not have authority to determine whether the airplane . . . met the criteria for forfeiture." *Vereda*, 271 F.3d at 1374–75. Innovair argues that *Vereda* is distinguishable because the merits of the Government's forfeiture are not at issue in this case, as Innovair has already challenged the Government's forfeiture and prevailed at the Ninth Circuit. *See Basler*, 1996 WL 88075. Although Innovair is correct that the TLA was forfeited despite not being forfeitable, Innovair was already granted appropriate compensation for the wrongful forfeiture when the Arizona Court awarded Innovair the substitute *res* bond amount. *See* 21 U.S.C. § 881(a)(4)(C) ("A party who is innocent of wrongdoing [may] not have its interest in property forfeited.").

Innovair's disagreement with the Arizona Court's valuation of the TLA in the substitute *res* bond is a separate issue. The substitute *res* bond amount was what the Government had in its possession in exchange for the TLA as a result of the Arizona Court's valuation of the TLA. The Ninth Circuit found that the Arizona Court had jurisdiction only up to the bond amount, and its belief concerning the fair value of the TLA is irrelevant. *Basler*, 1996 WL 88075, at *1–*2 ("[W]hat Innovair paid [for the TLA] is not necessarily, or even particularly, a proper measure of what its rights were worth."). Further, although Innovair argued that the Arizona Court undervalued the TLA in the second appeal to the Ninth Circuit, Innovair previously argued in its objection to the substitute *res* bond at the Arizona Court that the bond amount

was "artificially inflated." It cannot now complain that the TLA was undervalued by the Arizona Court.

Notwithstanding Innovair's failure to object to the substitute *res* bond's extinguishing clause at the Arizona Court or to appeal the bond's approval to the Ninth Circuit, the CSA's comprehensive statutory scheme limits Innovair's relief to that obtainable through the district court, not the Court of Federal Claims. *See Vereda*, 271 F.3d at 1375. Innovair's failure to challenge the extinguishing clause of the TLA is dispositive and limits its recovery.

For the foregoing reasons, we conclude that Innovair has not asserted a claim within the Court of Federal Claims' jurisdiction. Because the trial court improperly exercised jurisdiction over Innovair's claim, we reverse. Thus, we need not consider the Government's other appeal grounds, namely whether the transfer of the TLA constituted a taking for public use without just compensation and whether a 10% discount rate used to calculate the fair market value of the TLA was improper.

## CONCLUSION

Because Congress provided a comprehensive administrative and judicial system in the district courts to review the *in rem* forfeiture of property seized pursuant to 21 U.S.C. § 881, we hold that the Court of Federal Claims did not have subject matter jurisdiction over this case and reverse.

## **REVERSED**

No costs.